JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

**NATIONAL SCHOOL OF AERONAUTICS, Inc., Operated as the National Trade School,**

v.

**The UNITED STATES.**

No. 20–53.

United States Court of Claims.
June 5, 1956.

Paul W. Walter, Cleveland, Ohio, for plaintiff. Loyal V. Buescher and Walter & Haverfield, Cleveland, Ohio, on the brief.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff sues to recover an amount, in addition to what it has been paid, for the training which it furnished to veterans during the period March 1, 1950, to February 28, 1951. Under Public Law 16, 78th Congress, 57 Stat. 43, Regulation No. 1(a), pt. 8, 38 U.S.C.A. following section 745, relating to the vocational rehabilitation of disabled veterans, and Public Law 346, 78th Congress, 58 Stat. 284, as amended, 59 Stat. 623, 38

U.S.C.A. § 693 et seq., relating to the education and training of veterans who were not disabled, the Government was to pay the tuition of the veterans in the schools in which they were enrolled. The question for decision in the instant case is whether the rate of tuition which the plaintiff was entitled to be paid during the year in question was the higher rate which had been set in the contract for the preceding year, or the lower rate which was set, over the protest of the plaintiff, in the contract for the year in question. The plaintiff contends that, under the provisions of Public Law 266, enacted August 24, 1949, 63 Stat. 631, 652 et seq., the rate of tuition contracted for in the year preceding the year in question became "frozen" as the legal rate, and hence the purported reduction of that rate by contract for the year in question was ineffective.

The plaintiff conducted a trade school in Kansas City, Mo., which had been established at some date prior to June 22, 1944, had discontinued operations, and resumed them in June 1946. It gave courses in shoe repairing, drafting, electricity, plumbing and automotive repair, for nonveterans, for disabled veterans under Public Law 16 and for nondisabled veterans under Public Law 346. Under Public Law 16, it was necessary for a school to make a contract with the Veterans Administration. The plaintiff made its first such contract on June 17, 1946, and it continued to train disabled veterans under a series of such contracts until February 8, 1952. It also commenced its training of nondisabled veterans under Public Law 346 in June 1946. It had no formal contract with the Veterans Administration for this training until March 1, 1949.

Public Law 346 did not, as did Public Law 16, require that contracts be made with schools for tuition. It provided, in Section 5, that the Veterans Administration should pay the school the customary cost of tuition, not to exceed $500 per year. It was apparently supposed that most of the Public Law 346 students would be in established schools which would have large numbers of students whose tuition was not being paid by the Government, and that if the Government paid the same rate for veterans as other students paid, it would not be in danger of being overcharged.

The Veterans Administration, by September 30, 1947, seems to have come to the conclusion that some schools were establishing unreasonably high tuition rates. Schools whose students were practically all veterans could publish rates within the $500 limitation but still unreasonably high in relation to the cost and value of the training, and if few nonveterans were willing to pay those rates, they could still collect them from the Government as the "customary rates." On September 30, 1947, the Administrator of Veterans Affairs authorized all the regional office managers of the Administration to negotiate contracts at fair and reasonable rates with schools as to which the regional office managers thought that procedure was necessary.

Change No. 4 to Veterans Administration Manual M7–5 was promulgated as a Regulation on May 17, 1948. It required that contracts be negotiated, beginning July 1, 1948, with certain schools operating for profit, including those which came into existence after June 22, 1944, the date of enactment of Public Law 346, and those which had increased their tuition rates in excess of 25 percent. The Kansas City Regional Office of the Veterans Administration concluded that Change No. 4 did not apply to the plaintiff because it had been in existence prior to June 22, 1944.

On February 18, 1949, effective March 1, 1949, Change 9 to Manual M7–5 was promulgated. It extended Change 4 by requiring schools to submit cost data and contract for fair and reasonable rates if they had not been in continuous operation since June 22, 1944. It also made the new requirements applicable to nonprofit schools, which meant that many more schools would be interested in and affected by the regulation. Change 9 applied to the plaintiff since, as we have seen, though it had existed before June

22, 1944, it had discontinued operations and not resumed them until June 1946. The plaintiff was then required to submit cost data, and it entered into a series of annual contracts covering the period March 1, 1949, to February 1952, at which time it ceased to operate.

Many schools refused to submit to the requirements of Change 9, or to enter into contracts, hoping that the courts would invalidate Change 9. There was much confusion. The Veterans Administration sought to have the substance of Change 9 incorporated in a statute. To the provision of the bill which was to be the Independent Offices Appropriation Act, 1950, appropriating funds for the education and training of Public Law 346 veterans, a proviso was added containing in substance the language of Change 9. On the complaint of representatives of the schools that it would be burdensome for them to have to file cost data year after year, a further proviso was added "freezing" the rate of the most recent contract after contracts had been executed for two successive years. The Independent Offices Appropriation Act, 1950, containing the provisions referred to above, was enacted August 24, 1949. It was Public Law 266.

On February 28, 1950, the plaintiff executed a contract with the Veterans Administration covering the education of veterans under Public Law 346 for the succeeding year, the year involved in this suit. It will be remembered that it had executed a contract a year earlier, pursuant to Change 9. The Government says that the March 1, 1950, contract was only the second contract, and that the lower rates embodied in it were the rates that became frozen, under Public Law 266. The plaintiff says that the contract made in 1949 under Change 9 was the second contract, or at least the second contract, since it had been making Public Law 16 contracts for the rehabilitation of disabled veterans since 1946, and also because other earlier writings which it had submitted concerning Public Law 346 veterans were contracts within the meaning of Public Law 266.

We consider first the question of whether the Public Law 16 contracts were contracts which froze the rates embodied in them, within the meaning of Public Law 266. In that Act, which made appropriations for all the independent offices of the Government, a separate part was applicable to the Veterans Administration. That part was divided into eight items, the appropriation for each item being separate from the others, and the funds not being transferable from one item to another. Two items relate to payment for vocational rehabilitation of disabled veterans under Public Law 16. One item with the heading "Readjustment benefits" appropriates money for payment for education and training benefits under Public Law 346. In this item are contained the provisions for the determination of fair and reasonable rates which are the subject of interpretation in this case.

The statute, on its face, would not suggest that the contracts mentioned in it as having the effect of freezing rates, making them *ipso facto* fair and reasonable, would be contracts other than those relating to the subject matter to which the language in question is a proviso, i. e., the expenditure of money for the education of veterans under Public Law 346. The impetus for the insertion of the proviso came from the Veterans Administration, which sought to cure what seemed to it to be an evil. If Public Law 16 contracts had the effect of freezing rates, the statute would have had little to operate on, since such contracts had been made from the beginning of the operation of Public Law 16, and rates in most schools would have been frozen before the enactment of Public Law 266, and even before the promulgation of Change 9.

Contracts under Public Law 16 were not arrived at in such a way as to safeguard the public funds, which was the intent of Public Law 266. The number of disabled veterans rehabilitated under Public Law 16 was only a relative handful compared with the number schooled under Public Law 346. The veterans

Administration could not have afforded to make the careful study of cost data and value of the training for the relatively small saving which would result from keeping the Public Law 16 tuition down to a reasonable figure. Public Law 16 contracts were not, in fact, established by bargaining nor on the basis of cost data. They merely embodied the tuition rates charged to nonveteran students.

The plaintiff claims that certain other writings which passed between it and the Government before the contract of March 1, 1949 was made, were "contracts" within the meaning of the freezing provision of Public Law 266, and that for that additional reason its 1949 contract was at least the second contract, and its rates were the frozen rates. In the early administration of Public Law 346, the Finance Division of the Veterans Administration Regional Offices paid the invoices of the schools training veterans after examining catalogs, memoranda and other literature of the schools which indicated what the schools were charging nonveteran students, i. e., what their customary rate of tuition was. It was often difficult to learn, with assurance of accuracy, what these customary rates were. Forms were developed for obtaining this information from the schools, and the forms were improved as experience indicated how they could be improved. In 1947 "Institution Charge Data" sheets became the form for the submission by the schools of the required information. These sheets, called Form VASL7–1167, contained spaces for tuition rates, length of course, rate of compensation charged for handling of books, and a list of student holidays. The form was to be executed by the president of the school and had a space for the signature of the Contract Supervisor in the Training Facilities Section of the Regional Office of the Veterans Administration. These forms when filled out merely gave information as to what the schools were charging nonveteran students. They were not contracts. The signature of the Contract Supervisor was an authorization to the Finance Division to pay the rates certified in the form as certified by the school. The school could have unilaterally decreased or increased its tuition rates and, if it had amended its form VASL7–1167, it would have been legally entitled to the changed rates. This situation continued until Change 9 to the Veterans Administration Manual M7–5 was promulgated, effective March 1, 1949, which was also the effective date of the plaintiff's first formal contract.

On the basis of the materials considered above, it seems to follow that neither the Public Law 16 contracts nor the VASL7–1167 forms which the plaintiff executed before March 1, 1949, were contracts within the meaning of the freezing provision of Public Law 266. The plaintiff, however, urges that the Congressional intent was otherwise, and cites legislative history which, it says, proves its contention.

After the enactment of Public Law 266 on August 24, 1949, the Veterans Administration on September 8, 1949, promulgated Instruction No. 1 to that law, which instruction specifically excluded Public Law 16 contracts from the category of contracts which would freeze rates. On September 23 there was introduced in the Senate and referred to the Committee on Labor and Public Welfare, S. 2596 which provided that contracts under Public Law 16, or any other agreements in writing on the basis of which tuition payments had been made from the Treasury of the United States should be considered contracts for the purpose of the freezing provisions of Public Law 266. S. 2596 provided that it should be retroactive to August 24, 1949. The Veterans Administration expressed to the Committee its objections to S. 2596, both orally and in writing. S. 2596 was approved by the Committee and was passed by the Senate on October 12, 1949. On October 14 the Committee on Veterans Affairs of the House of Representatives reported S. 2596 and recommended that it pass. On October 18 the bill was considered by the House under a request for a unanimous consent rule and was presented for immediate passage. A Con-

gressman objected and consideration was deferred. Congress adjourned on October 20.

On May 11, 1950, the House passed S. 2596. As passed by both the Senate and the House, the bill contained the words, "effective August 24, 1949". As it emerged from conference, and was finally enacted, it stated that it was effective from the date of enactment. It was enacted on July 13, 1950. The House Managers stated in the Conference Report:

> "The provisions in Public Law 266, which now govern many of the subjects contemplated by this Act, are repealed effective the date of the enactment of this Act. Previously the provision had been in both bills that it would be repealed August 24, 1949."

S. 2596, when enacted, became Public Law 610, 64 Stat. 336.

On August 16, 1950, the Veterans Administration issued a writing interpreting Public Law 610. This interpretation aroused protest and on September 13 the Senate Committee on Labor and Public Welfare recommended approval of Senate Concurrent Resolution No. 107. It was passed unanimously by the Senate on the next day. It related to Public Law 610, and referred to the statement of the House Managers quoted above. It may be susceptible of the interpretation that Public Law 610 was intended to apply the freezing provisions of Public Law 266 to Public Law 16 contracts made before the enactment of Public Law 610. There was no action in the House of Representatives on Senate Concurrent Resolution No. 107. On August 27, 1951, Senate Resolution No. 124, with the same content as Senate Concurrent Resolution No. 107 was passed by the Senate.

Some other statements of members of Congress bearing on the intent of Congress intended to be expressed in Public Law 266 and Public Law 610 have been called to our attention. Recalling that S. 2596 which became Public Law 610 contained language expressly making it retroactive to the date of enactment of Public Law 266, but that, as finally enacted, it contained equally express language making it effective from the date of enactment, we see no room for interpretation as to whether or not it was to be retroactive. Whatever may have been the opinion of individual members as to the intent of Congress, the Congress as an entity, with those who were managing the legislation for it fully aware of the problem, made its choice. It would be quite improper for us to reverse that choice, to write an effective date into the legislation different from the one that Congress, by no stretch of the imagination inadvertently, wrote into the statute.

The plaintiff produced as a witness a former member of the United States Senate who was Chairman of the Veterans Subcommittee of the Senate Labor and Public Welfare Committee which considered the bill which ultimately became Public Law 610. This witness gave oral testimony as to what was intended by Public Law 610. At first blush it might seem that this would be the ideal way to learn the intent of a legislative body, to get it straight from the mouth of a responsible member of the legislature. Second thought leads to the conclusion that the practice would be intolerable. A legislature speaks through statutes, and, in cases where the statutes require interpretation, through committee reports and debates. No member of a legislature, outside the legislature, is empowered to speak with authority for the body. If he may testify voluntarily, other members of his legislative body with different views or different recollections may be summoned to give their differing versions. The debate, which, so far as the lawmaking body is concerned, should have been ended by the enactment of the statute, would be transferred to the court, with disturbing possibilities of embarrassment and friction.

It is only fair to the plaintiff to say that the Government, in the case of Bergh v. United States, 132 F.Supp. 462, 132 Ct.Cl. 564, originated this practice, so far as we can recall. In neither that

case nor this should the witness have been tendered, or the testimony admitted.

Our conclusion is that the plaintiff's tuition rates were frozen by the contract dated February 28, 1950, V3032v–325. The parties have stipulated that, that being the case, the Government is entitled to recover $70,533.94 on its counterclaim.

The plaintiff's petition is dismissed. The defendant may have a judgment for $70,533.94 on its counterclaim.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.