**N. C. FREED COMPANY, INC., and International Roofing Corp., Plaintiffs-Appellees,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM and Federal Trade Commission, Defendants-Appellants.**

No. 49, Docket 72–1381.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1972.

Decided Feb. 1, 1973.

Thomas J. Press, Atty., Dept. of Justice, Washington, D. C. (L. Patrick Gray, III, Asst. Atty. Gen., H. Kenneth Schroeder, Jr., U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., of counsel), for defendants-appellants.

Joseph J. Lyman, Washington, D. C., for plaintiffs-appellees.

Brief of amicus curiae in support of defendants-appellants filed by Mark E. Budnitz, Atty., the National Consumer Law Center, Inc., Chestnut Hill, Mass.

Before MOORE, HAYS and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

The Board of Governors of the Federal Reserve System (the Board) and the Federal Trade Commission (FTC) appeal from a judgment and order of the United States District Court for the Western District of New York declaring invalid a regulation promulgated by the Board pursuant to the Truth-in-Lending Act, which comprises Title I of the Consumer Credit Protection Act[1] (the Act). The action for declaratory judgment and injunction was brought below by appellees N. C. Freed Company, Inc., and International Roofing Corp., two corporations in the home improvement industry organized under the laws of the State of New York, pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201) and the Administrative Procedure Act (5 U.S.C. §§ 701–706).[2] Appellees sought, and the district court granted, a two-part order (1) declaring invalid 12 CFR § 226.-9(a),[3] which was designed to implement

---

1. 15 U.S.C. § 1601 et seq.

2. The appellees' standing to challenge the regulation in question was conceded. *See* Abbott Laboratories v. Gardner, 387 U.S. 136, 139–140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); and Barlow v. Collins, 397 U.S. 159, 166–167, 90 S.Ct. 832, 25 L.Ed. 2d 192 (1970).

3. 12 CFR § 226.9(a) provides:
   (a) *General rule.* Except as otherwise provided in this section, in the case of any credit transaction in which a security interest *is or will be retained or acquired* in any real property which

Section 125(a) of the Act,[4] on the ground that the Board exceeded its Congressionally conferred authority in overextending the reach of said Section; and (2) enjoining the FTC and all other federal agencies from enforcing the regulation.

## I.

The relevant facts are not disputed by the parties. The business of the appellees is derived almost entirely from credit transactions with homeowners wishing to have improvements made on their homes. The usual business procedure followed by the appellees involves salesmen who call upon the homeowner in an effort to secure contracts for the performance of home repair work. The contracts ordinarily provide that the appellees will perform the work on the homeowner's premises for an agreed price, on credit terms. At the time the contract is executed the homeowner-obligor is not required to execute a (second) mortgage, deed of trust, or other indenture on his residence as a condition for the extension of credit. He is, however, required to sign an unsecured promissory note to the contractor's (appellees') order, for the contract price of the work. Typically, the promissory note is then negotiated or assigned by appellees to a bank or other financial institution. By operation of law in many states such a promissory note spawns various statutory liens, such as mechanic's, materialmen's, artisan's, and similar type liens, on the consumer's home at the time the work is commenced.[5]

Section 125(a) of the Act requires that a creditor (*e. g.*, appellees or a fi-

is used or is expected to be used as the principal residence of the customer, the customer shall have the right to rescind that transaction until midnight of the third business day, following the date of consummation of that transaction or the date of delivery of the disclosures required under this section and all other material disclosures required under this part, whichever is later, by notifying the creditor by mail, telegram, or other writing of his intention to do so. Notification by mail shall be considered given at the time mailed; notification by telegram shall be considered given at the time filed for transmission; and notification by other writing shall be considered given at the time delivered to the creditor's designated place of business. (footnote omitted, emphasis added.)

"Security interest" is defined in 12 CFR § 226.2(z) as follows:

(z) "Security interest" and "security" mean any interest in property which secures payment or performance of an obligation. The terms include, but are not limited to, security interests under the Uniform Commercial Code, real property mortgages, deeds of trust, and other consensual or confessed liens whether or not recorded, mechanic's, materialmen's, artisan's, and other similar liens, vendor's liens in both real and personal property, the interest of a seller in a contract for the sale of real property, any lien on property arising by operation of law, and any interest in a

lease when used to secure payment or performance of an obligation.

4. 15 U.S.C. § 1635(a). This section provides:

(a) *Disclosure of obligor's right to rescind.*

Except as otherwise provided in this section, in the case of any consumer credit transaction in which a security interest *is retained or acquired* in any real property which is used or is expected to be used as the residence of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required under this section and all other material disclosures required under this part, whichever is later by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, an adequate opportunity to the obligor to exercise his right to rescind any transaction subject to this section. (emphasis added.)

5. *See e. g.*, N.Y. Lien Law § 3 (McKinney's Consol.Laws, c. 33, 1966).

nancial institution) furnish the consumer with a notice of the right to rescind the home improvement contract within three days from the date of its execution in any credit transaction[6] wherein a security interest *is retained or acquired* in the consumer's residence. Pursuant to Section 105 of the Act,[7] which directs the Federal Reserve Board to "prescribe regulations to carry out the purposes of [Section 125]", the Board promulgated the challenged regulation, which provides that a consumer shall have the right to rescind a credit transaction within three days from the date of its execution where a security interest *is or will be retained or acquired* by a creditor in the consumer's home.[8] The present controversy centers upon the verb tense difference between the language of Section 125(a), "is retained or acquired", and that of the regulation, "is or will be retained or acquired." The appellees argued successfully below that the Board has improperly extended the reach of Section 125(a) to cover non-consensual or statutory liens arising *in futuro*, and that Congress had intended that the right of rescission prescribed by the Section would pertain only to second mortgages or other consensual liens given by the homeowner at the time the contract is executed. On cross-motions for summary judgment the district court entered judgment for appellees, concluding that the regulation exceeded the Board's authority and was thus unlawful:

That much of the regulation pertaining to security interests that *will be* retained or acquired is beyond the Board's power and is an invilad implementation of Section 125(a).

\* \* \* \* \* \*

The plain fact is that Congress in enacting Section 125(a) made rescindable only those contracts which acquired a security interest through a mortgage, deed of trust, or other consensual type lien, and did not include liens which might arise in the future by operation of law.[9] (emphasis added)

The Federal Reserve Board and the FTC on appeal argue that the challenged regulation is both necessary and proper to effectuate the purposes of the Truth-in-Lending Act, and that, in seeking to protect unwitting consumer-homeowners from home improvement frauds, Congress did not intend to restrict protection provided by the Act solely to consensual liens, such as second mortgages, but intended to include *all liens* resulting from a consumer credit transaction. The narrow issue we must here decide is whether the Federal Reserve Board exceeded its authority by including statutory liens within the rescission provision of the Truth-in-Lending Act. Our close reading of the legislative history leads us to agree with the position taken by appellants Federal Reserve Board and Federal Trade Commission and, accordingly, we reverse the judgment below.[10]

---

6. Under § 125(a) and the applicable regulations a "consumer credit" transaction is one for which a finance charge (see 12 CFR § 226.2) is or may be imposed or which, pursuant to an agreement, is or may be payable in more than four installments. It is not disputed by the parties herein that the appellees engage in consumer credit transactions within this definition.

7. 15 U.S.C. § 1604. This section provides, in relevant part:
   The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for

such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

8. See note 3 *supra*.

9. N. C. Freed Company, Inc., and International Roofing Corp. v. Board of Governors of the Federal Reserve System and Federal Trade Commission, Civil No. 1970–43 (W.D.N.Y., filed Sept. 29, 1971) at 6, 7–8.

10. We note that the District of Columbia Circuit Court of Appeals has recently

## II.

■■ The avowed purpose of the Consumer Credit Protection Act, enacted in 1968 after eight years of Congressional consideration, was to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." [11] The Act is remedial in nature, designed to remedy what Congressional hearings revealed to be unscrupulous and predatory creditor practices throughout the nation.[12] Since the statute is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated. See Peyton v. Rowe, 391 U.S. 54, 64–65, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

In *Tcherepnin* the Supreme Court held that the term "securities", for purposes of the Securities Exchange Act, should be construed broadly because of the remedial nature of that statute, legislation designed to protect investors through the requirement of full disclosure by issuers of securities. The Court stated that in defining "security" under the Exchange Act (as we must determine the proper scope of "security interest" under the Truth-in-Lending Act), "form should be disregarded for substance and the emphasis should be on economic reality." (*Id.*) *See also* Johnson v. Southern Pac. Co., 196 U.S. 1, 14–18, 25 S.Ct. 158, 49 L.Ed. 363 (1904); FTC v. Mandel Bros., Inc., 359 U.S. 385, 388–389, 79 S.Ct. 818, 822, 3 L.Ed.2d 893 (1959) ("We deal with remedial legislation of a regulatory nature where our task is to fit, if possible, all parts into an harmonious whole."

One "economic reality" of the home improvement industry is that, in work such as that performed by the appellees, second mortgages and statutory liens are used extensively to secure payment of home improvement contracts that are ordinarily "insecure" business ventures.[13] Our reading of the legislative history demonstrates that although Congress was concerned in Section 125(a) *primarily* with abuses flowing from creditor use of *second mortgages* as a security device, it was equally concerned with abuses stemming from use of other types of liens:

[A]nother provision of the bill is also vitally important. That is the Cahill amendment, or rather a series of amendments in the House, to strike at home improvement racketeers who trick home owners, particularly the poor, into signing contracts at exorbitant rates, *which turn out to be liens on the family residences.* Any credit transaction which involves a security

ruled on the precise issue raised in this appeal. We concur with the conclusions reached by Judge Robb in Gardner and North Roofing and Siding Corp. v. Board of Governors of Federal Reserve System, 464 F.2d 838 (D.C.Cir. 1972).

11. 15 U.S.C. § 1601. For discussion of the historical background of consumer credit regulation, *see* Jordan and Warren, A Proposed Uniform Code for Consumer Credit, 8 B.C.Ind. & Com.L.Rev. 441, 441–49 (1967).

12. Prior to passage of the Act the extent of home improvement frauds was staggering, with costs to consumers, according to the National Better Business Bureau report for 1965, totalling somewhere between $500 million and $1 billion annually. Hearings on S.J.Res. 130, S. 3065 and S. 3066 Before the Senate Commerce Com-

mittee, 90th Cong., 2d Sess., ser. 90–64, at 75 (1968), in Unfair Practices in the Home Improvement Industry and Amendments to the FTC Act (1968) [hereinafter cited as Hearings on S.J. 130].

During Congressional debate it was noted that:

[M]isrepresentations are made directly to the borrower by the mortgage discount lender or a broker who offers to arrange home improvement repairs or consolidation of all homeowner's debts into "one easy monthly payment." * * * [I]n many cases [the homeowner] is never informed nor aware that his home is being made subject to a mortgage. 114 Cong.Rec. pt. 2, 1611 (1968) (remarks of Representative Cahill).

13. Hearings on S.J.Res. 130, *supra*, at 10, 43, 70, 241–42.

interest in property must be clearly explained to the consumer as involving a *mortgage or lien*; any such transaction involving the consumer's residence—other than in a purchase-money first mortgage for the acquisition of the home—carries a 3-day cancellation right.[14] (emphasis added.)

The typical home improvement contract is procured, usually under pressure conditions, by a prime contractor (such as the appellees) who frequently possesses little or no capital of its own; the actual work is often done by various subcontractors.[15] When the promissory note signed by the homeowner is assigned or negotiated to a financial institution, which can then assert holder-in-due-course status against him,[16] his premises become vulnerable not only to the statutory liens available to the prime contractor, but also to the various mechanic's and materialmen's liens of the subcontractors, as well as to the secured position of the holder-in-due-course financial institution. Thus, if the homeowner should default in payment to the prime contractor, the latter could levy on the home to obtain payment, that is, unless the contractor has waived its statutory liens. But even though the prime contractor may waive its liens in the contract, it usually cannot waive statutory liens arising in favor of subcontractors,[17] so that if the prime contractor fails to pay its subcontractors the latter can also levy on the home to collect payment.[18] Conceivably, then, in many states even if the homeowner has already paid the prime contractor, in order to protect his home from subcontractor statutory liens, he may also have to pay the subcontractors, thus paying twice for the same work.

The appellees recognize the existence of this problem but they argue, and the district court agreed, that, because Section 125(a) speaks of a mortgage or lien that *is retained or acquired*, liens arising in the future by operation of state law were meant to be excluded since they are not "retained or acquired" at the time the contract is executed by the parties. This argument, however, flies in the face of established authority that a contract will be deemed to include in its terms all rights conferred upon the parties by the laws of the state in which the contract is executed. See Von Hoffman v. City of Quincy, 4 Wall. (71 U.S.) 535, 550, 18 L.Ed. 403 (1866), where the Supreme Court early held that "the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of·it, as if they were expressly referred to or incorporated in its terms." Hence statutory liens do not, as the district court ruled, arise only in the future; they may be retained or acquired at the time the credit transaction is executed. In some states mechanic's liens relate back to, and attach, as of the time of the original contract.[19] In numerous states mechanic's liens relate back to, and attach, as of the time work on the home is

---

14. 114 Cong.Rec., pt. 11, 14388 (1968) (remarks of Representative Sullivan). Representative Patman, summarizing the Conference Report accompanying the bill, stated concerning § 125(a):

    This section, passed by the House, deals *primarily* with mortgage transactions where *unwanted home improvements* are sold to homeowners by sharp or fraudulent operators. *Id.* at 14384 (emphasis added).

15. Hearings on S.J.Res. 130, *supra*, at 75, 104, 171. *See also*, Note, Mechanics' Liens and Surety Bonds in the Building Trades, 68 Yale L.J. 138, 138–39 (1958).

16. *See generally*, Comment, Judicial and Statutory Limitations on the Rights of a "Holder in Due Course" in Consumer Transactions, 11 B.C.Ind. & Com.L.Rev. 90 (1969).

17. The laws with respect to waiver of statutory liens vary among the states. See Annot., 76 A.L.R.2d 1087 (1961).

18. Hearings on S.J.Res. 130, *supra*, at 42–43, 241–42.

19. *See e. g.*, Ill.Ann.Stat., c. 82 § 1 (Supp. 1972); Me.Rev.Stat.Ann., tit. 10, c. 603 § 3251 (Supp.1972–73).

commenced or materials are furnished.[20] It is clear to us that in Section 125(a) Congress intended to establish a national policy of protecting consumers whose residences are jeopardized by operation of all types of security interests acquired by creditors in the home improvement industry, and that the goal was to provide uniform protection throughout the nation, irrespective of the vagaries among the states' lien laws.[21] Because of the various differences among the states in the treatment of statutory liens, and the opportunities for evasion of Section 125(a) which these differences make possible, consumers can be effectively protected only if *all* statutory liens are included within the regulatory ambit of that Section. With an awareness of the multifarious pitfalls created by statutory liens, through which a homeowner may unwittingly lose one of his most precious possessions, his home, it would be most incongruous for us to construe Section 125(a) in the manner urged by the appellees: that is, that Congress intended the statute to require disclosure and three-day right of rescission as to some, but not all, of the various security interests created by a home improvement contract. We think that the only way in which the Act's objective of "meaningful disclosure" of credit terms may be achieved is if the various statutory liens are included and treated uniformly under the Truth-in-Lending Act; this Con-

gress intended through the operation of Section 125(a), and this the Federal Reserve Board recognized in 12 CFR § 226.9(a). Carving statutory liens out of the protection provided by Section 125(a) would not only render impossible such uniformity among the states, it would defeat the goal of providing "meaningful" disclosure to the consumer. We refuse to perform such a surgical procedure.

Ruling on this precise issue in Gardner and North Roofing and Siding Corp. v. Board of Governors of Federal Reserve System, 464 F.2d 838 (D.C.Cir. 1972), the District of Columbia Circuit has, we think, correctly determined the question:

> We think it a reasonable construction of the statute that Congress intended to require disclosure of all the consequences flowing from the signing of a home improvement contract; including not only the consequences spelled out in the contract, but also those necessarily inherent therein. Any other construction would expose the homeowner to hidden and perhaps fatal traps; it would lead to precisely the kind of imposition that Congress intended to prevent. Viewed in this light we think the challenged regulation is entirely consistent with the legislative purpose and is a reasonable and proper device for carrying it out. 464 F.2d at 842.

**20.** *See* Annot., Osborne, Mortgages, § 214 at 397–98 (2d ed. 1970) ; 3 Powell, The Law of Real Property, ch. 38 ¶ 488, at 758.15–758.17 (1967). In some states an assignment of the right to a mechanic's lien may be made at the time the contract is executed, even though the lien has not been filed by the assignor, and even though the work has not yet commenced. *See e. g.*, Colo.Rev.Stat. § 86–3–17 (1963).

Congressional hearings also revealed an unsavory practice of contractors and subcontractors known as "spiking the job," through which statutory liens are immediately invoked to the advantage of the contractors and subcontractors, and the disadvantage of the homeowner. In this practice, the creditor (contractor or

subcontractor) goes to the consumer's home within hours after the contract is signed and makes a token performance of work or furnishing materials. The creditor pressures the homeowner into the belief that the contract is now nonrescindable because work has commenced; then he leaves and no further work is done on the contract for perhaps weeks or months. Hearings on S.J. 130, *supra*, at 10, 18, 44, 105.

**21.** For discussion regarding the substantial lack of uniformity among state lien laws, *see* Osborne, Mortgages, § 214 at 394–95 (2d ed. 1970) ; 3 Powell, The Law of Real Property, ch. 38, ¶ 484, at 730–736 (1967).

### III.

We conclude that, in ruling that the right of rescission provided by Section 125(a) applies only to cases in which the creditor retains or acquires a *consensual* lien, or second mortgage, the district court relied on a too technical and narrow construction which eviscerates the statute, and which renders consumers susceptible to the very abuses Congress sought to prevent. We hold that the Federal Reserve Board did not exceed its authority in defining "security interest" to include statutory liens, and in interpreting the right of rescission provided in Section 125(a) as extending to such statutory liens. The challenged regulation constitutes a clarification, and not an improper extension, of the statute and it therefore does not exceed the bounds of the mandate given the Board by Congress.[22] Since the regulation is clearly consistent with the legislative purpose,[23] it may not be overturned. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). And since the regulation constitutes a contemporaneous construction of a statute by the agency charged by Congress with the administration of the Act, the Board's construction is entitled to deference. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Gardner and North Roofing and Siding Corp., *supra*, 464 F.2d at 842. Appellees' position on appeal, relying as it does on a hypertechnical construction of the language in Section 125(a), would enable disreputable firms to act in an underhanded manner. We fail to see how the three-day right of rescission provided in Section 125(a), as

implemented in 12 CFR § 226.9(a), can cause harm to reputable business firms.

Accordingly, we reverse the judgment below.

---

22. *See* note 7, *supra*.

23. The appellees place great reliance on a letter dated June 16, 1969, from Congressman Cahill, a sponsor of the Act, written one year after enactment, to support a contrary view of legislative intent. The letter does not constitute part of legislative history and is entitled to no weight in this Court. *See* National School of Aeronautics, Inc. v. United States, 142 F. Supp. 933, 938, 135 Ct.Cl. 343 (1956):

No member of a legislature, outside the legislature, is empowered to speak with authority for the body. If he may testify voluntarily, other members of his legislative body with different views or different recollections may be summoned to give their differing versions. The debate, which, so far as the lawmaking body is concerned, should have been ended by the enactment of the statute, would be transferred to the court, with disturbing possibilities of embarrassment and friction.