589 F.2d 1175
 BECTON, DICKINSON AND COMPANY, Plaintiff-Appellee,
v.
FOOD AND DRUG ADMINISTRATION, Donald Kennedy, Commissioner
of Food and Drugs, William C. Lubas and Richard N.
James, Investigators, Food and Drug
Administration, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
BECTON, DICKINSON AND COMPANY, a corporation doing business
as Bard-Parker, Division of Becton, Dickinson and Company
and Wesley J. Howe, William L. Clark, James A. Levy and
Kenneth J. Summa, Individuals, Defendants-Appellees.
 Nos. 295, 296, Dockets 78-6109, 78-6137.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 30, 1978.
Decided Dec. 22, 1978.
 
 Catherine G. O'Sullivan, Washington, D.C. (U.S. Dept. of Justice, Washington, D.C., John H. Shenefield, Asst. Atty. Gen., John J. Powers, III, Dept. of Justice, Richard M. Cooper, Chief Counsel, Kenneth C. Baumgartner, Associate Chief Counsel, Food and Drug Administration, Rockville, Md., of counsel), for defendants-appellants.
 Charles T. Beeching, Jr., Syracuse, N.Y. (Bond, Schoeneck & King, Syracuse, N.Y., Henry H. Melchor, Syracuse, N.Y., Geoffrey R. W. Smith, Covington & Burling, Washington, D.C., of counsel), for defendants-appellees.
 Frank E. Samuel, Jr., Vice President and Gen. Counsel, and Howard M. Holstein, Asst. Gen. Counsel, Washington, D.C., of counsel, for Health Industry Manufacturers Association, Washington, D.C., Amicus Curiae, in support of plaintiff-appellee Becton, Dickinson and Co.
 Before MOORE, FRIENDLY and GURFEIN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal by the United States on behalf of the Food and Drug Administration (FDA), its Commissioner, and two FDA investigators, and on its own behalf, from an order of the District Court for the Northern District of New York, 448 F.Supp. 776 (1978), requires us to construe certain provisions relating to "restricted devices" which were added to the Federal Food, Drug, and Cosmetic Act by the Medical Device Amendments of 1976 (hereafter "Amendments"), 90 Stat. 539.
 
 
 2
 The overall purpose of the Amendments is explained in the Report of the House Committee on Interstate and Foreign Commerce, H.R. Rep. No. 94-853 on H.R. 11124, 94th Cong. 2d Sess. (1976) (hereafter "Report"). See also Report of the Senate Committee on Labor and Public Welfare, Sen. Rep. No. 94-33 on S. 510, 94th Cong. 1st Sess. 2-7 (1975); Report of the Committee of Conference, H.R. Rep. No. 94-1090 on S. 510, 94th Cong. 2d Sess. 51 (1976), U.S.Code Cong. & Admin.News 1976, p. 1070. The Food and Drugs Act of 1906, 34 Stat. 768, had not dealt with "devices". However, during the next 30 years there developed "a growing awareness that the absence of any authority to regulate the safety and reliability of medical devices presented a serious danger to the American public." Report 6. In recognition of this, the Federal Food, Drug, and Cosmetic Act of 1938, 52 Stat. 1040, in addition to expanding federal authority to regulate food and drugs, provided for the regulation of cosmetics and "devices" as defined in § 201(h), 52 Stat. 1041. The provisions dealing with devices were generally more limited than those pertaining to drugs. The 1976 Amendments greatly augmented the authority over devices in an effort "to assure the safety and effectiveness of medical devices intended for human use". Report 3.
 
 
 3
 The then feeble provisions of the 1938 Act for inspection of factories, warehouses, or other establishments, § 704, 52 Stat. 1057, requiring permission of the owner, applied to devices on the same basis as to food and drugs. The parity continued when, in 1953, Congress put teeth into the inspection section by eliminating the need to obtain the owner's permission. 67 Stat. 476-77. However, when § 704 was again strengthened in 1962, 76 Stat. 792-93, the additional authority to inspect all things in the establishment, with certain specified exceptions, bearing on possible violations of the Act "(including records, files, papers, processes, controls, and facilities)" the point here at issue was limited to "prescription drugs". That term is not included in the Act's list of definitions but, since the 1962 amendments, has been used in the misbranding section, § 502(n), 76 Stat. 791, and its substance also appears in an exemptive section, § 503(b), which was enacted as part of the original Act, 52 Stat. 1052, and extensively amended in 1951, 65 Stat. 648-49.
 
 
 4
 The keystone of the 1976 Amendments is § 513(a), which classifies "devices intended for human use" into three categories. Class I consists of devices for which sections of the existing statute as amended and certain new sections, including § 520, "are sufficient to provide reasonable assurance of the safety and effectiveness of the device." Class II devices are those for which these provisions "are insufficient to provide reasonable assurance" but "for which there is sufficient information to establish a performance standard to provide such assurance". Class III devices are those for which only premarket approval provides reasonable assurance of safety and effectiveness.
 
 
 5
 Section 520, with which we are here concerned, is entitled "GENERAL PROVISIONS RESPECTING CONTROL OF DEVICES INTENDED FOR HUMAN USE." Sub-section (e), entitled "Restricted Devices", reads as follows:
 
 
 6
 (e)(1) The Secretary may by regulation require that a device be restricted to sale, distribution, or use
 
 
 7
 (A) only upon the written or oral authorization of a practitioner licensed by law to administer or use such device, or
 
 
 8
 (B) upon such other conditions as the Secretary may prescribe in such regulation,
 
 
 9
 if, because of its potentiality for harmful effect or the collateral measures necessary to its use, the Secretary determines that there cannot otherwise be reasonable assurance of its safety and effectiveness. No condition prescribed under subparagraph (B) may restrict the use of a device to persons with specific training or experience in its use or to persons for use in certain facilities unless the Secretary determines that such a restriction is required for the safe and effective use of the device. No such condition may exclude a person from using a device solely because the person does not have the training or experience to make him eligible for certification by a certifying board recognized by the American Board of Medical Specialists or has not been certified by such a Board. A device subject to a regulation under this subsection is a restricted device.
 
 
 10
 (2) The label of a restricted device shall bear such appropriate statements of the restrictions required by a regulation under paragraph (1) as the Secretary may in such regulation prescribe.
 
 
 11
 The Amendments also modified the provision in § 704(a) allowing inspection of "all things" in an establishment, including records, files, papers, etc. so that this should apply not only to "prescription drugs" as theretofore but also to "restrictive devices."[1]
 
 
 12
 In April, 1977, FDA inspectors commenced a routine inspection of a Becton, Dickinson & Co. (B-D) facility at Hancock, N.Y., which concededly was engaged in the manufacture of "devices" intended for use by or on the prescription of a physician or other licensed practitioner, and asked to review production, control and complaint records under the authority of § 704(a) as amended. After initially refusing access, B-D permitted the FDA inspectors to view these records. The inspectors were able to see only a few, however, before B-D abruptly declined to allow further access. The FDA then sought and obtained a warrant dated May 6, 1977, from the district court. Upon their return with the warrant the inspectors were allowed access to some of B-D's complaint files, which the inspectors found to disclose deficiencies of some seriousness. When they returned the following day, further access to B-D's records and files was refused.
 
 
 13
 On May 17, 1977, B-D filed a complaint in the District Court for the Northern District of New York seeking relief in the form of: 1) a declaration that the FDA lacks authority to inspect records, files, papers, or other documents at the Hancock facility relating to "restrictive devices" until such time as regulations are properly promulgated by the FDA under the 1976 Medical Devices Amendments; 2) an injunction against such an inspection until proper regulations are adopted; and 3) an order vacating the Warrant of Inspection of May 6, 1977. The Government moved for dismissal for failure to state a claim upon which relief can be granted and B-D for summary judgment. On September 6, 1977, the Government brought an action seeking injunctive relief against further refusals to allow inspection; it moved for a preliminary injunction and defendants for dismissal for failure to state a claim. On April 11, 1978, the district court granted summary judgment to B-D on its complaint and dismissed the Government's.[2] This appeal followed.
 
 
 14
 If one were to look only at the words of the Statute, the decision of the district court would be plainly correct. When Congress in 1976 enlarged the record inspection provision of § 704(a) to include records relating to "restricted devices", it was using a term that had not theretofore been in the Act but was defined in the Amendments. Section 520(e)(1) tells us that "restricted devices" means "(a) device subject to a regulation under this subsection." The Secretary is authorized to impose restrictions on sale, distribution, or use in a regulation if, because of the device's "potentiality for harmful effect or the collateral measures necessary to its use, the Secretary determines that there cannot otherwise be reasonable assurance of its safety and effectiveness." The adoption of regulations under § 520(e) is governed by the Administrative Procedure Act, 5 U.S.C. § 553, as supplemented by § 520(d) of the Federal Food, Drug, and Cosmetic Act. Admittedly, however, no regulations under § 520(e) have yet been adopted in the manner required by the APA and § 520(d).
 
 
 15
 The Government, however, puts forward a substantial answer to this seemingly ineluctable logic. Since 1938 the Act had contained § 502(f), 52 Stat. 1051, which reads as follows:
 
 
 16
 A drug or device shall be deemed to be misbranded
 
 
 17
 (f) Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users: Provided, That where any requirement of clause (1) of this subsection, as applied to any drug or device, is not necessary for the protection of the public health, the Secretary shall promulgate regulations exempting such drug or device from such requirement.
 
 
 18
 In applying this section the Secretary has long exempted from the requirement of adequate directions for use both drugs and devices sold on prescription of a licensed practitioner. See 3 Federal Register 3168 (1938). This exemption reflects the practical recognition that some beneficial drugs or devices were of such a nature that it was impossible to prepare labeling with "adequate directions for use". After Congress required certain drugs to be sold by prescription in 1951, 65 Stat. 648, the Secretary incorporated those requirements into the exemptive regulation for prescription drugs, and promulgated a separate subsection exempting prescription medical devices. 17 Federal Register 6818-819 (1952). The exemption for prescription drugs is now codified at 21 CFR § 201.100; the exemption for prescription devices at 21 CFR § 801.109. We set forth the prescription devices exemption in the margin.[3] On June 4, 1976, about one week after the Amendments became law, the Secretary published in 41 Federal Register 22,620, a notice entitled "Implementation of the Medical Device Amendments Act of 1976." This states, Inter alia :
 
 
 19
 Restricted devices include all prescription devices as now defined in 21 CFR 801.109 (21 CFR 201.109 prior to recodification published in the Federal Register of February 13, 1976 (41 FR 6696)). (See House Report No. 94-853, Medical Device Amendments, February 29, 1976, at 24-25.)
 
 
 20
 Additional notices and proposed regulations will be published in future issues of the Federal Register covering these and other aspects of the Amendments.
 
 
 21
 Id. at 22621.
 
 
 22
 The notice specifically informed the industry of the FDA's view that duly authorized FDA representatives now had authority to inspect records concerning "restricted devices" as thus defined.
 
 
 23
 The Government does not contend that the notice in the Federal Register met the requirements of 5 U.S.C. § 553 and § 520(d) of the Federal Food, Drug, and Cosmetic Act with respect to future rulemaking on what constitutes a restrictive device. It relies on the notice simply as fair advice to the industry of the FDA's position that the previously adopted prescription device regulation was sufficient under § 520(e), and that new regulations would be necessary only for further restrictions on sale, distribution, or use. Its position, as clarified at argument, is that a "restrictive device" under § 520(e) is a device the manufacturer of which had taken advantage of the "prescription device" regulation or such other devices as might be defined by future rulemaking.
 
 
 24
 There is a good deal to be said for this position as a matter of common sense.[4] The standards specified in § 520(e), "its potentiality for harmful effect or the collateral measures necessary to its use", are two of the three standards mentioned in the "Prescription devices" regulation and the omission of the third, "the method of use", would seem to be a change of form rather than of substance. If the attention of Congress had been focused on the problem, it might well have approved use of the prescription device regulation on a temporary basis until further rulemaking could be had much as, in the Occupational Safety and Health Act of 1970, 29 U.S.C. § 655(a), it authorized the Secretary of Labor to promulgate for a two-year period without regard to the APA "any national consensus standard, and any established Federal standard" unless he found that this would not result in improved safety or health for specifically designated employees. Moreover, unlike the district judge, 448 F.Supp. at 779 and n. 4, we do not read § 520(e)(1) as forbidding the Secretary from using language approaching the generality of the statute if, after appropriate rulemaking procedures, he should find it impracticable to be more specific.[5] Certainly Congress did not mean to require the Secretary to wade a tiresome way through the whole area of "devices" and make specific determinations with respect to each with the consequence, among others, that a new device would not be "restricted" until a special rule had been developed for it.
 
 
 25
 We hold, however, that this is not enough to carry the day for the Government. A reading of subsections 520(d) and (e) makes two points clear: One is that Congress was careful to provide a rulemaking procedure in which all participants would have a full opportunity to present their views and analyses of the data underlying the proposed regulation. The other is that Congress intended that the Secretary in fact, his delegate, the Commissioner, 21 CFR § 5.1 determine that the particular restriction on sale, distribution or use is justified by the risks presented by the device. Once that determination is made, other portions of the Amendments pertaining to restricted devices, such as the extended power of inspection, advertising requirements, and listing rules, see note 1 Supra, would take effect. The two points are interrelated. Even if the Government is correct that the rulemaking proceeding leading to the promulgation of the prescription device regulation provided adequate notice and opportunity for comment, that comment would have been addressed not to a proposal that would burden the industry with restrictions on distribution and sale as well as other obligations but at a regulation which would exempt the device in question from a potentially burdensome statutory requirement. Moreover, the proposed regulation would leave the determination whether the device's potential for harm necessitated sale by prescription to the industry, at least in the first instance. Regulations under § 520(e), however, were to represent the decision of the Secretary, thereby promoting the maximum uniformity and predictability that may be feasible in an increasingly complex industry. We find nothing that warrants a different conclusion on pages 24-25 of the Report, cited in the FDA's Federal Register notice, where the House Committee states that § 520(e) "supersedes and adds" to the prescription authority derived from § 502(f), or in the fact that earlier drafts of § 520(e) used the term "prescription devices" rather than "restricted devices", see Hearings on H.R. 5545, H.R. 974, and S. 510 before the Subcommittee on Health and the Environment of the House Committee on Interstate and Foreign Commerce, 94th Cong. 1st Sess. 71, 196 (1975), or in any other legislative history.[6] When we take account of the congressional emphasis on careful procedures and well-defined regulations, the Government's construction is likewise not warranted by the principle requiring that due regard be given to administrative interpretation, Cf. Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), or by decisions that a "liberal construction" should be given to the Federal Food, Drug, and Cosmetic Act in the interest of public health, see United States v. An Article of Drug . . . Bacto-Unidisk, 394 U.S. 784, 798, 84 S.Ct. 1410, 22 L.Ed.2d 726 (1969), especially since, as noted above, the Secretary, if necessary, can develop broad, categorical regulations, a burden which should not be too heavy.
 
 
 26
 This is the second occasion within the year in which we have been obliged to strike down an FDA essay in procedural brinkmanship, see National Nutritional Foods Ass'n v. Kennedy, 572 F.2d 377, 383-86 (2 Cir. 1978). The agency should realize that such efforts, however well intended, are likely to be counterproductive. Within a few weeks after publication of the notice in the Federal Register on June 4, 1976, the FDA was made aware not only that its procedures would be challenged by the industry but that the Chairman of the House Subcommittee, Representative Rogers of Florida, who had co-sponsored the 1976 Amendments, considered the FDA's declaration that prescription devices were restricted devices to be illegal absent a rulemaking proceeding under § 520(d). Although "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage," Regional Rail Reorganization Act Cases, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974), see also N.C. Freed Company, Inc. v. Board of Governors of the Federal Reserve System, 473 F.2d 1210, 1217 n. 23 (2 Cir.), Cert. denied, 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed.2d 61 (1973), Representative Rogers' letter of June 21, 1976, to the Commissioner should at least have been taken as a serious danger signal. If rulemaking had then been initiated, it could have been completed by the end of 1976. When the procedural provisions of a statute are doubtful, as the FDA must have recognized these to be, the longer way round may be the shorter way there. Now, after two years have been spent in asserting a legal position that it must have known to be questionable, the FDA finds itself back at square one, unless some other court of appeals or higher authority should differ with us.
 
 
 27
 Affirmed.
 
 
 
 [1]
 Two other provisions of the Amendments impose special requirements on "restricted devices." The Amendments added to § 502, the misbranding section, a new subsection (r) establishing special requirements with respect to the advertising of any restricted device, 90 Stat. 577-78. The comprehensive revision of the registration section, § 510, 90 Stat. 579, provides in subsection (j)(1)(B)(i), that in the case of certain drugs and of restricted devices, the manufacturer shall file with the Secretary a copy of all labeling, a representative sampling of advertisements and, upon request made by the Secretary for good cause, a copy of all advertisements. Also the Amendments incorporate the criteria for restrictions set forth in § 520(e) as limitations on the authority to enact performance standards, § 514(a)(2)(B)(v), 90 Stat. 546-47, and to require premarket approval, § 515(d)(1)(B)(ii), 90 Stat. 554
 
 
 [2]
 In a footnote, 448 F.Supp. at 780 n. 6 the court properly condemned B-D for having taken it on itself to refuse to comply with a facially valid warrant rather than to seek preliminary injunctive relief
 
 
 [3]
 § 801.109 Prescription devices
 A device which, because of any potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use is not safe except under the supervision of a practitioner licensed by law to direct the use of such device, and hence for which "adequate directions for use" cannot be prepared, shall be exempt from section 502(f)(1) of the act if all the following conditions are met:
 (a) The device is:
 (1)(i) In the possession of a person, or his agents or employees, regularly and lawfully engaged in the manufacturer, transportation, storage, or wholesale or retail distribution of such device; or
 (ii) In the possession of a practitioner, such as physicians, dentists, and veterinarians, licensed by law to use or order the use of such device; and
 (2) Is to be sold only to or on the prescription or other order of such practitioner for use in the course of his professional practice.
 (b) The label of the device, other than surgical instruments, bears:
 (1) The statement "Caution: Federal law restricts this device to sale by or on the order of a ______", the blank to be filled with the word "physician", "dentist", "veterinarian", or with the descriptive designation of any other practitioner licensed by the law of the State in which he practices to use or order the use of the device; and
 (2) The method of its application or use.
 (c) Labeling on or within the package from which the device is to be dispensed bears information for use, including indications, effects, routes, methods and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purpose for which it is intended, including all purposes for which it is advertised or represented: Provided, however, That such information may be omitted from the dispensing package if, but only if, the article is a device for which directions, hazards, warnings, and other information are commonly known to practitioners licensed by law to use the device. Upon written request, stating reasonable grounds therefore, the Commissioner will offer an opinion on a proposal to omit such information from the dispensing package under this proviso.
 (d) Any labeling, as defined in section 201(m) of the act, whether or not it is on or within a package from which the device is to be dispensed, distributed by or on behalf of the manufacturer, packer, or distributor of the device, that furnishes or purports to furnish information for use of the device contains adequate information for such use, including indications, effects, routes, methods, and frequency and duration of administration and any relevant hazards, contraindications, side effects, and precautions, under which practitioners licensed by law to employ the device can use the device safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented. This information will not be required on so-called reminder-piece labeling which calls attention to the name of the device but does not include indications or other use information.
 (e) All labeling, except labels and cartons, bearing information for use of the device also bears the date of the issuance or the date of the latest revision of such labeling.
 
 
 [4]
 It has been approved by a judge in the District of Massachusetts who expressly declined, in dictum, to follow the decision below. In re Establishment Inspection of Portex, Inc., No. MBD-78-272 (D.Mass., July 28, 1978), Appeal dismissed, No. 78-1406, Slip Opinion (1 Cir., October 25, 1978), and, as the Government tells us, by another district judge in California, who did not discuss the problem, In re Establishment Inspection of American Technology, Inc., No. CV-78 (C.D.Cal., June 14, 1978)
 
 
 [5]
 Alternatively, he might use the statutory language as a catch-all
 
 
 [6]
 Annexed to the Government's brief are 26 pages from a publication known as Medical Devices, Diagnostics & Instrumentation Reports, which tell what was said and done at "markup" sessions of the Subcommittee on Health and the Environment of the House Committee on Interstate and Foreign Commerce. These accounts, a result of the "sunshine" policy, contain the details of spontaneous exchanges among subcommittee members, staff and FDA counsel. Reliance on such material, which we do not find illuminating in this case in any event, as an aid to interpretation is fraught with danger. Apart from possibly serious questions of authenticity and completeness, the gap between such committee room interchanges and the intent of the legislature is generally too wide. Even so staunch a champion of resort to legislative history as a guide to interpretation as Mr. Justice Frankfurter warned against the kind of digging that would afford "hitherto unsuspected opportunities for assuring desired glosses upon innocent-looking legislation . . . ." Shapiro v. United States, 335 U.S. 1, 48-49, 68 S.Ct. 1375, 1400, 92 L.Ed. 1787 (1948) (dissenting opinion). See also Bok, The Tampa Electric Case, 1961 Supreme Court Review 267, 290, protesting against "safaris into legislative documents that succeed only in flushing a phrase here and a sentence there whose connection with the will of Congress is questionable at best."